Wilson *v.* Hill.

HARRIS WILSON *vs.* JOSIAH HILL and CATHARINE his wife and FRANCES WATTS.

The question is well settled at common law that the cancellation of a deed by consent of parties will not divest, the grantee, and revest in the grantor an estate which has once vested.

The title to lands vested in a married woman by an unrecorded deed can· not be divested by her parol consent that such deed may be cancelled, and a conveyance made by her grantor to her husband.

The testimony of a married woman, illegally elicited before a grand jury on a charge of bigamy against her husband, is not admissible against her on a question of property.

Can a grand juryman, being a witness in a suit respecting property, dis· close the secrets of the grand jury room ?   *Query.*

A *feme covert* was seized of certain lands.   She being ill, consented, at the solicitation of her husband, to the cancellation of her deed and to a con· veyance from her grantor to her husband.   During her lifetime her hus· band married a second wife.   Being imprisoned on charge of bigamy, he and his mistress reconveyed the lands to his wife, she and her husband executing a mortgage for the benefit of the husband to a third ·party ; this mortgage was afterwards assigned to complainant, who was a law· yer, the counsel of the husband, and had knowledge that the property had been held by the husband in trust, and that the mortgage was also held in trust for the husband—it was *held* that the complainant had suffi· cient knowledge to put him on inquiry ; that he was not a *bona fide* holder, and that the mortgage was void in his hands.   .

*Zabriskie,* for complainant.

*Gilchrist,* for defendants.

THE CHANCELLOR.    This bill is filed to foreclose a mortgage purporting to be given by Josiah Wilson and Catharine his wife to Peter Bentley, and by him assigned to the complainant.    Frances Watts is made a defendant, as the owner of the equity of redemption.

The execution of the bond and mortgage are duly proved.    They respectively bear date on the 26th of December, 1854, and are given to secure the payment of $1500.    The mortgage is recorded upon the same day.

On the same 26th of December a deed was executed by Josiah Hill and Catharine his wife to Frances Watts, acknowledged on the 27th, and recorded on the 28th of that month.  The deed contains this clause, *viz.* "subject to the operation of two mortgages on the said premises— one for $600, and the other for $1500—which the said Frances Watts hereby covenants and agrees with the said Josiah Hill to pay off, with the interest on the same, having retained a sufficient sum to pay the same out of the consideration money."

The scrivener swears that the clause was inserted in pursuance of the agreement between the parties.  This, upon the face of the papers and upon the complainant's evidence, makes a very plain case for the mortgagee.

But the defendant, styled in the bill Frances Watts, has filed an answer, in which she alleges that she now is, and at the date of these instruments was the lawful wife of Josiah Hill; that they were married at the Sailor's Bethel in Boston, by Elder Rand, in the year 1839; that he was at that time a congregationalist minister; that they lived together as man and wife for fourteen years, and down to within a short period of the execution of these papers, when her husband married a servant girl in his family, named Catharine, who united with Hill in the deed and mortgage already referred to as his wife.  She further states that the property in dispute was her separate property, purchased and paid for partly by money which she had at the time of her marriage and partly by the accumulations of her industry while the wife of Hill; that the deed for the property was originally executed to her in her name, but that the title was obtained from her during a period of severe illness, and a new deed taken from the original grantor in the name of her husband; that the deed was made to her husband because it was expected that she would then die, and that on her recovery her husband promised to reconvey it; that but $25 was due when the mortgage was given, and that is

the only amount which in equity can be recovered upon it.
This answer raises a number of important issues, both
of law and of fact. The first and most important of these
questions, which lies at the foundation of the whole in-
quiry, is—was the defendant Frances the wife of Josiah
Hill, as alleged in the answer.

The fact of the marriage is not proved, either by record
or by the testimony of any witness present at the cere-
mony. But it is proved, by numerous and unimpeached
witnesses, that the parties lived together, cohabiting as
and reputed to be man and wife, for many years previous
to the date of this transaction; that during such cohabit-
ation she had two children, which were recognised by
the husband as his; that in the year 1847, while Hill and
Frances were so living together, a deed was executed to
her for a tract of land in the county of Somerset, upon
which they subsequently resided. That deed contains
the following clause: "which said tract or parcel of land
is conveyed to the said Frances Hill, wife of Josiah, and
to her heirs and assigns for ever, the farm having been
purchased by her with her own separate funds."

Hill subsequently united in the conveyance of this
property with Frances as his wife, representing it as Mrs.
Hill's property. He joined with her as his wife repeat-
edly in the conveyance of property, the title to which was
in himself. He united with her as his wife in the ac-
knowledgment of these instruments. The cohabitation
between the parties and their repeated formal recogni-
tions of the marital relation continued till nearly the date
of the mortgage in controversy. This furnishes compe-
tent and plenary evidence of the fact of the marriage.

But it is urged that this evidence is met and overcome
by counter testimony, viz. her own oath to the contrary
and her acceptance of the deed from Hill and Catharine
his wife.

These instruments, as well the bond and mortgage of
the complainant as the deed to Frances Hill, the defend-

ant, by the name of Frances Watts, were cotemporaneously executed while the parties were all in confinement in the common jail of the county of Hudson. Hill was in confinement on a charge of bigamy for marrying Catharine, his pretended wife. Frances, the first wife, was brought by compulsory process before the grand jury to testify against her husband, and was sworn to testify upon that charge. According to the testimony of one of the grand jurors, being so sworn, she testified that she was never married to Hill; that she was not his wife; that the connection between them was a partnership. On that occasion she passed by and answered to the name of Frances Watts. The complaint, the juror adds, was unanimously dismissed upon her testimony solely.

Waiving all discussion of the long agitated question whether a grand juror should ever be permitted, upon a mere question of property, to violate privileged communications by disclosing the secrets of the grand jury room; assuming for the present, what I do not admit, that such evidence may be lawful, I think it clear that the evidence here offered is not admissible, and if admissible it is entitled to no weight whatever.

The change of deeds vested neither the legal nor the equitable title in the husband. He had neither when the mortgage in question was executed.

So the title remained until December, 1856, when the husband was arrested and imprisoned on a charge of bigamy for marrying Catharine, a second wife, while his wife Frances was living. While the husband and both the females were in jail, a creditor, having a charge of $25 against Hill, desired the counsel of Hill to have it in some way secured. The scrivener and counsel of Hill thereupon visited the jail. A bargain, it is alleged, was made between the husband and wife to divide the property. The husband and his mistress first executed a mortgage upon the wife's property to the creditor for $1500, to secure $25, and then humanely conveyed the

wife's land to her subject to that mortgage. The wife is thereupon dragged illegally before the grand jury, and swears that she was never married. The bill of indictment is ignored and the husband discharged.

It would prove an interesting and instructive, though perhaps painful task, to enter that prison, to lift the curtain that conceals this transaction, and to disclose the means and influences that were used to bring about this result.

The wife was most unlawfully and improperly brought before the grand jury, and compelled to testify upon a criminal charge against her husband. There is no clearer principle of law than that a wife will not be permitted to testify against her husband on a charge of bigamy, even by the husband's consent. 2 *Starkie's Ev.* 399; *Gregg's case, Sir T. Raymond* 1; *Roscoe's Cr. Ev.* 114.

She is not permitted to testify for or against him—not for him on account of the strong influence and temptation she is under to pervert the truth in his favor, nor against him from fear of creating dissension. The evidence is excluded, and in my judgment most wisely excluded, upon principles of public policy.

No bill of indictment could lawfully have been found upon her testimony, nor if found would she have been admitted as a witness. The bill was dismissed not as the grand juror supposes upon *her* evidence, but simply because the state failed to prove what they were bound to prove affirmatively by competent evidence, to wit, the husband's marriage. The evidence is incompetent for or against the husband, and equally incompetent to affect favorably or unfavorably the rights of property of the wife. It cannot be that evidence thus unlawfully extorted from the wife for an unlawful purpose can be used to strip her of her rights of property.

But if the evidence could even be supported as *competent* it should be disregarded as of no *weight*. She was

called to consign her husband to infamy and imprison-
ment. The first prompting of her heart, if stung by
jealousy and incited by resentment, would be to sacrifice
him to her passions, or if she testified under the resistless
incentive of a woman's love, it would be to sacrifice herself
for his sake.

The fact that a deed was executed to her which appears
never to have been in her possession is of no weight.
We must regard the fact as established for all the pur-
poses of this cause, that at the date of these papers the
defendant Frances was the lawful wife of Josiah Hill, the
complainant.

As a consequence, it results that the alleged contract
made between them, in the jail or elsewhere, in regard to
her property was null and void as against her.

As another consequence of this fact, she is clearly en-
titled to her rights in the mortgaged premises as doweress
unaffected by this mortgage.

But she does not rest her rights upon this ground. She
claims the property as her own, and insists that this mort-
gage is fraudulent, null, and void. Let us see how far
the evidence sustains her answer upon this point. On the
27th of April, 1853, the mortgaged premises were con-
veyed by Bernart Heatley and wife, by deed duly exe-
cuted and acknowledged, to Frances Hill, the wife of
Josiah Hill. It was so stated in the deed. The deed
contained the usual covenants of seizin for quiet enjoy-
ment against encumbrances and of general warranty in
favor of the wife. That deed was made upon an exchange
of property between the parties. In performance of the
exchange, the parties entered into possession—Heatley of
the property at Rockaway conveyed by Hill and wife to
him; Hill and wife of the property at Jersey City received
in exchange. The deed remained in possession of the
scrivener, who was the counsel of Hill, till the month of
September. Hill then called upon his counsel, stated that
his wife was very sick, not expected to live—(they then

Wilson *v.* Hill.

lived together as man and wife). She had a bad and unruly boy, and did not want him to have the property. He wished the deed to his wife destroyed, and a new deed drawn from Heatley to *himself.* The counsel declined, unless by the wife's consent. He said she would consent, and he was very anxious to have it closed that night. At Hill's instance, counsel immediately drew the deed—went to Hill's house—found the wife in bed very low, not expected to live: and on being interrogated by counsel in the presence of the husband, she *consented* or *requested* that the deed to herself should be destroyed, and a new deed made to Hill. The counsel thereupon took the cars for Rockaway—roused Heatley's family from bed—surrendered the deed previously given to Mrs. Hill—had a new deed executed to Josiah Hill, and returned the same night to Jersey City. The Heatleys were told that Mrs. Hill was not expected to live, and that she requested or consented to the change. The deed, though executed and acknowledged on the 9th of September, was antedated to correspond with the date of the original deed to Mrs. Hill. On the 3d of October the deed was placed on record, and thus, without a private examination or an acknowledgment before an officer—without a dollar's consideration—the property of a wife in the last stage of debility and disease, upon a consent extracted at the husband's instance by the husband's counsel and in the husband's presence, is attempted to be transferred to the husband. There is strong reason, from the evidence, to believe that this property was paid for by the wife, and was in equity her sole and exclusive property. But that is totally immaterial—it is enough to know that the title was in her, and the presumption is that it was hers in equity, as well as at law, till the contrary is proved.

The legal title to these premises was vested in Mrs. Hill in April, 1853. The title, and possession under it, had been in her for six months at the time of the execu-

N*

tion of the new deed. Did the cancelling of her deed destroy her title?

The rule of the common law is perfectly well settled, that the cancellation of a deed by consent of parties will not divest the grantee and revest in the grantor an estate which has once vested. There must be a reconveyance. *Leech* v. *Leech*, 2 *Chan. Rep.* 100; *Touchst.* 70, *Roe* v. *Archbishop of York*; 6 *East*; 86 *Harrison* v. *Owen*, 1 *Atk.* 520; *Jackson* v. *Chase*, 2 *Johns. R.* 87; *Cheseman* v. *Whittemore*, 23 *Pick.* 231; *Raynor* v. *Wilson*, 6 *Hill* 469; *Lewis* v. *Payn*, 8 *Cowen* 75; *Holbrook* v. *Tirrell*, 9 *Pick.* 105; *Viner's Ab.*, *Fait's x* 2; *Miller* v. *Maynwaring*, *Cro. Car.* 399.

It is said, by the witness, that the mortgage was given for the husband's benefit. That is certainly a remarkable transaction. A bargain is made between the husband and wife to divide her property between them. A mortgage is given by the husband and his mistress upon his wife's property, in consideration, it would seem, of his letting his wife have the residue of the property, and perhaps take upon herself the guilt of rescuing her husband from an impending prosecution. In the hands of the original mortgagee, who was acquainted with the facts, the mortgage is worthless as against the wife's interest. He in fact disclaims all connection or participation in the matter. The paper was held for months in the hands of counsel for the husband's benefit.

On the 9th of June, 1854, it was assigned by the mortgagee, at the instance of the husband, to the present complainant, a counsellor at law of the city of New York. He insists that he is a *bona fide* holder for value; that he purchased the mortgage of the husband without notice of the wife's equity.

The legal principle is admitted, that although the mortgage was illegal and void in the hands of the original mortgagee, either for himself or as trustee for the benefit of the husband, both having full notice of the wife's equity, yet a purchaser without notice may enforce the claim.

But I do not think the complainant can stand in that position. He had been the counsel of Hill before; a large amount of his claim is for fees; he knew the parties; he knew that Mrs. Hill had her property in trust; he knew that this mortgage was in the hands of a third party in trust for the husband. He was bound to have ascertained the nature and character of the trust. There was enough to have put him on inquiry. If he did not know, he was bound to know what the real character of the transaction was.